In re CLAYTON GRAIN
ELEVATOR, INC., Debtor.

James G. HARRISON,
Trustee, Plaintiff,

v.

William Gary MITCHELL, Elaine
Mitchell, and William Mitchell,
Defendants.

Bankruptcy No. 582–00119–A.
Adv. No. 582–0225.

United States Bankruptcy Court,
W.D. Louisiana,
Alexandria Division.

Aug. 8, 1984.

Chatham H. Reed, Shreveport, La., for Trustee.

C. Brent Coreil, Ville Platte, La., for defendants.

---

### STATEMENT OF THE CASE

LeROY SMALLENBERGER, Bankruptcy Judge.

This adversary proceeding was filed on October 19, 1982, by the Trustee, as a complaint seeking declaratory relief combined with an application to sell movable property at private sale. The Trustee was in possession of certain items, including a mobile home, the possession of which had been abandoned. The property had been left on real estate belonging to the bankruptcy estate at the time this Chapter 11 was commenced in February, 1982, a period of eight months. The complaint denied all adverse claims of ownership and sought authority to sell the property free and clear of such claims.

The defendants are William Gary Mitchell, the former manager of the debtor corporation grain facility; Elaine Mitchell, his wife; and Mr. Mitchell's father, Reverend William Mitchell. The name of William Mitchell appears on the title to the mobile home, which is one of the subjects of this litigation.

The three defendants answered the complaint asserting ownership and denying generally the Trustee's allegations.

The Trustee amended his complaint at that time to amplify the original complaint, asserting that the Defendants appropriated funds of the corporation to their own use totalling $25,647.24 and, in addition, that the defendants have misappropriated some 135,357.33 bushels of soybeans with a market value of $812,143.98.

These beans had been delivered to the elevator over a period of time. When the bankruptcy was commenced, these beans were not available for distribution or liquidation. Additionally, the Trustee demanded of the three defendants an accounting for all corporate funds received. In default of an explanation or an accounting satisfactory to the Court, the Trustee asked for further judgment in like amount.

The plaintiff moved for discovery and production of documentary evidence. The defendant moved for a stay of the Chapter 11 proceeding "until full disposition of all criminal matters presently pending" involving the defendants were disposed.

This Court denied the Motion for Stay, and, at that point, the defendant sued the Trustee in Federal District Court, in civil action number 83–0520. In that suit, the defendant sought damages of $100,000.00 against the Trustee for embarrassment, mental anguish, etc. The Trustee moved for dismissal on the grounds that the Bankruptcy Court had jurisdiction of any claim against the Trustee, and Judge Scott agreed in a ruling filed September 9, 1983. Mr. Mitchell also sought to proceed *in forma pauperis*, but he abandoned that motion, and that relief was denied also.

## FINDINGS OF FACT

The Trustee introduced into evidence the depositions of Mr. William Gary Mitchell and his wife. In their depositions the Mitchells invoked various privileges, including that against self-incrimination, husband-wife confidentiality, and the secrecy required of witnesses who have testified before a grand jury. There is little, if any, substance actually contained in the deposition transcripts, and the attorney for the Trustee stated to the Court that the depositions were introduced into evidence to show the uselessness of calling the Mitchells to testify on cross-examination.

Mr. Harrison, the Trustee, testified that the debtor corporation was incorporated in 1975 and is located in Clayton, Louisiana, on approximately five acres of land. The corporation has an elevator facility, a hardware and seed store, and a residence. Behind the residence is a mobile home.

The debtor corporation was in the business of buying, selling, and storing grain—primarily wheat and soybeans. The shareholders of the corporation employed William Gary Mitchell as the general manager at a salary of $1,200.00 a month, plus 10% of the net profits as a bonus. In addition, Mr. Mitchell was provided the residence. There was no record or testimony that Mr. Mitchell had corporate authorization to place the mobile home on the corporate property for the use of Mr. Mitchell's mother. Absent proof of corporate authorization, the Court finds that Mr. Mitchell did not have corporate authorization to place the mobile home on corporate property for the use of his mother.

In January, 1982, a shortage of funds and beans was discovered at the elevator. The house was abandoned, and it became obvious that someone "left in a hurry." At the time that the Trustee was appointed, the District Attorney for the parish had seized all the records of the corporation found on the premises, and the District Attorney still had the records at the time of trial.

The Trustee examined the bulk of the corporate records, grain storage tickets, and summaries prepared by corporate personnel. This examination was made pursuant to an order by this Court directed to the District Attorney allowing the Trustee to examine the records under the District Attorney's custody.

The Court finds that the Trustee inventoried the contents of the house and trailer shortly after he was appointed, and that he released all items for which proof of ownership was obtained.

The Court finds that the following corporate bank accounts were available to Mr. William Gary Mitchell in his capacity as manager for use in the corporate business.

| NAME OF ACCOUNT | PERIOD WHEN OPEN |
|---|---|
| Louisiana Central Bank Commodity Account #600–653–0 | 5/26/79 – 2/8/82 |
| Louisiana Central Bank Special Account Account #600–701–7 | 2/28/77 – 2/8/82 |
| Louisiana Central Bank Black River Account Account #601–300–7 | 9/9/81 – 2/5/82 |
| Sicily Island State Bank Regular Account # | 1/29/75 – 2/11/82 |
| Sicily Island State Bank Clayton Seed and Hardware Account # | 1/30/79–2/11/82 |
| Concordia Bank & Trust Special Account # | 2/21/78 – 2/8/82 |

The Trustee testified that he was unable to locate any authority from the records of the corporation for Mr. Mitchell to sell beans left at the elevator for storage or for Mr. Mitchell to trade on the future markets on behalf of the corporation. The defendant did not offer any testimony or evidence to prove that he did have authority to sell beans left at the elevator for storage or for the defendant to trade on the futures market on behalf of the corporation. Absent proof that Mr. Mitchell had such authority, the Court concludes that Mr. Mitchell did not have corporate authority to sell beans left at the elevator for storage nor to trade on the future market on behalf of the corporation.

The Court finds that Mr. Mitchell was involved in the operation of the following businesses at the same time he was general

manager of the debtor corporation's elevator:

BIM Equipment Company

B & M Trucking Company

I & M Cattle Company

Lee Bayou Kennel Company

The Trustee's Exhibit 15 is a financial statement prepared by William Gary Mitchell and dated May 1, 1980. It reveals that Mr. Mitchell asserted a ½ interest in the B & M Trucking Company. The other interest in the trucking company was owned by Mr. Walter Beebe, and he was the other owner. Beebe was also an employee of the elevator at the Black River Facility.

The debtor corporation used the trucks of B & M Trucking Company to haul beans. Mr. Mitchell, as manager of the debtor corporation's elevator, never put the hauling of beans up for bidding. The debtor corporation also bought spray equipment and parts from BIM Equipment Company, but there was not any evidence that any bidding was required from other companies.

The Trustee testified and supported his testimony with documents that $20,660.76 was paid by the debtor corporation to BIM Equipment Company, and also that he could not find a justification for the payment of this sum by the debtor corporation to the BIM Equipment Company. In the absence of justification, authorization, or even an explanation by the defendant why this money was paid to BIM Equipment Company the Court concludes that the money was paid without justification or authorization.

The Trustee testified that he examined the brokerage accounts with several brokerage firms shown in the records of the debtor corporation. The Trustee testified as to the following accounting: $466,850.00 paid to A.G. Edwards, $16,450.00 paid to Reinhold and Gurdner, $16,601.00 paid to Merrill Lynch, and $7,500.00 paid to Lincoln Commodities totaling $507,401.00 paid to brokers. The Trustee further testified that the debtor corporation received only $37,232.00 from these same brokers. The net loss of the transactions amounted to $470,168.73. The Trustee testified that the money was paid to the brokers because of margin calls. The Court accepts the Trustee's testimony on the above stated accounting of the transactions with the brokers as a true statement of the facts. The Court has already found that Mr. Mitchell was not authorized to trade in the futures market on behalf of the debtor corporation.

The Court finds that numerous checks from the debtor corporation's general account and the commodity account were paid to retail and appliance dealers. Some of the checks carried notations that payment was for specified items, such as "table and six chairs", "down payment on china cabinet", etc. On one of the checks there was no named payee, but an endorsement was made by Dixie Bedding and Furniture Company. The Trustee could not find corporate authorization for such purchases, and the defendant did not offer an explanation to the Court for such purchases. The purchases appear to be personal property and not the type of property that the debtor corporation would authorize. Absent proof of authorization to the defendant to make such purchases on behalf of the debtor corporation, the Court finds that the defendants did not have corporate authorization to use corporate funds to purchase personal property.

The Trustee's Exhibit No. 4 is the copy of the certificate of title on the 1971 Akin Mobile Home located behind the residence owned by the debtor corporation. The face of the title indicated that Reverend William Mitchell, the father of Gary Mitchell, acquired this mobile home on February 4, 1982. The debtor corporation filed a petition, under Chapter 11, on February 2, 1982. The Reverend Mitchell testified that the mobile home was transferred into his name as a gift, but the Reverend Mitchell was unable to recall who owned the mobile home before him. Under the circumstances surrounding the method by which Reverend Mitchell acquired title in the mobile home, and the fact that he was unable to offer a satisfactory explanation of how he acquired title to the mobile home, the Court

finds that the mobile home was purchased with corporate funds and was transferred to the Reverend Mitchell without corporate authorization and without justification.

The Court also finds that the corporation paid the electrical bill for the mobile home, which amounted to $2,500.00.

The Trustee's Exhibit No. 6 consists of copies of checks payable to Walter Beebe from both the elevator regular account and the commodity account. The total of the sums paid to Mr. Beebe by the checks was $21,350.00. There is no indication that these checks were payroll checks, because there are no deductions indicated. The Court as previously stated is aware that Mr. Mitchell and Mr. Beebe were involved in businesses together, and under the circumstances the payment of funds to Mr. Beebe may well have benefited Mr. Mitchell's other businesses. The defendant did not offer an explanation of the consideration to the debtor corporation for the funds paid to Mr. Beebe. Therefore, the Court concludes that there was inadequate consideration for the funds paid by the debtor corporation to Mr. Beebe. The Court also concludes that the funds were paid to Mr. Beebe without authorization and without justification.

Portions of Trustee Exhibits Numbers 7 and 10 indicate that the Reverend Mitchell received checks totalling $3,300.00 from the commodity account and $1,400.00 from the elevator regular account. There was no evidence that Reverend Mitchell was employed by the debtor corporation in any capacity whatsoever. Considering the circumstances surrounding the events in this case, the Court recognizes the likelihood that what work the Reverend Mitchell did perform that he performed the work for some of Mr. Gary Mitchell's other businesses and not the debtor corporation. The Court concludes that there was inadequate consideration for the funds paid by the debtor corporation to the Reverend Mitchell, and the funds were paid to Reverend Mitchell without authorization and without justification.

Trustee's Exhibit No. 8 is a check on the commodity account payable to BIM Equipment Company for $7,924.08. There is an absence of proof of any consideration for the payment of said check by the debtor corporation to BIM Equipment Company, and the defendant did not offer any explanation for the payment of this check to BIM Equipment Company. The Court concludes that there was inadequate consideration for the payment of said funds to BIM Equipment Company, and the funds were paid to BIM Equipment Company without authorization and without justification.

Trustee's Exhibit No. 10 includes a check to B & M Trucking Company for $8,000.00 from the commodity account. There was an absence of proof of any consideration to the debtor corporation for the payment of this check to B & M Trucking Company, and the defendant did not offer any explanation for the payment of said check. The Court concludes that the payment of said check was without consideration to the debtor corporation, and the funds were paid to B & M Trucking Company without authorization and without justification.

The Trustee's Exhibit No. 14 is a check in the amount of $1,054.70 drawn on the commodity account for a 1979 Honda ATC 110. The Trustee testified that the vehicle had not been located. However, the Trustee's Exhibit 15 indicates that Mr. Mitchell completed a financial statement which indicated and asserted ownership in such a vehicle in Mr. Mitchell, personally. The defendant did not offer an explanation why the debtor corporation would pay money for a personal auto of the defendant. The Court finds that there was without consideration for the check payable by the debtor corporation for an auto when the title to said auto was transferred to the defendant, and the funds were paid for the 1979 Honda ATC 110 without authorization and without justification.

The Trustee's Exhibit No. 17 is a copy of a check in the amount of $2,874.73 to Bluff City Motors. This check was in payment of Invoice 90588 which indicates repairs on a 1981 Ford Mustang automobile. The to-

tal repairs shown on the invoice matches the amount of the check. Additionally, Trustee's Exhibit No. 18 is a check in the amount of $1,640.44 payable to Ford Motor Credit Company. Attached to the check is a copy of the chattel mortgage on the vehicle, and the mortgage indicates that amount was one of the annual payments for the 1981 Ford Mustang. This money came from the special elevator account. A 1981 Ford Mustang was not located which belonged to the corporation. The defendant did not offer an explanation for these transactions. The Court holds that these transactions were without consideration to the debtor corporation, and these funds were paid without authorization or justification.

The Trustee's Exhibit No. 19 is a check for $3,247.00 drawn on the commodity account and payable to Ann Marie Dugger. Exhibit No. 19 is also a letter from Mr. Mitchell to Mrs. Dugger indicating that he was sending funds from the commodity account for payment of the first installment on the property. Also there is a letter from Mr. Mitchell to the Clerk of Court for the county in which the property was located transmitting a Clayton Grain Elevator check for $83.12 to redeem the property from a tax sale. The Trustee further testified that a corporate check paid to the Federal Land Bank was negotiated in Mississippi. There is no record of any loan to Mr. Mitchell to be used for the purchase of the property, and the property does not appear of record in the name of the debtor corporation.

It appears that Elaine Mitchell wrote to DeKalb Ag Research to inquire about a refund of some $4,374.37 due to Clayton Grain Elevator for return of seeds. The Trustee's Exhibit 20 includes a letter from DeKalb Ag Research to Mrs. Mitchell stating that the money had been refunded. The Trustee's Exhibit 20 shows that the refund check was endorsed by Mr. Mitchell and deposited in the Lee Bayou Kennel Account. The Court finds there was no authorization or justification for the deposit of these funds in the Lee Bayou Kennel Account.

The following is a summary of the disbursements from the special and the commodity accounts to individuals and entities discussed in this opinion:

| | |
|---|---|
| Lee Bayou Kennels | $ 5,255.00 |
| BIM Equipment | $20,660.76 |
| B & M Trucking Company | $16,200.00 |
| Walter Beebe | $22,750.00 |
| Elaine Mitchell | $ 2,100.00 |
| Reverend William Mitchell | $ 1,900.00 |
| Cash | $19,394.00 |

The Court finds that there was no authorization or justification for these payments.

Mr. Leon Doles is the farm manager for the Rita Quinta Plantation which is shown on Exhibit 2 as one of the owners of the beans which are the subject of that exhibit. Mr. Doles testified that it had been his practice to deliver beans to two locations, one being the Clayton Grain Elevator, in Clayton, and the other being the Concordia Grain Elevator located next to the Mississippi River. The beans delivered to the Concordia Grain Elevator were delivered through the Clayton Grain Elevator's account at the Concordia Grain Elevator. Thus Dole's account at the Clayton Grain Elevator included deliveries to both locations.

Mr. Doles testified that the beans were delivered to the Clayton Grain Elevator or the Concordia Grain Elevator for two purposes, and the two purposes only were either for storage or for sale.

Mr. Doles testified that in the past that whenever his beans were sold at his direction and authorization that he was paid. In the 1981 bean season, beans were delivered to either the Clayton Grain Elevator or to the Concordia Grain Elevator, and Mr. Doles had specific discussions with Gary Mitchell regarding the disposition of the beans. Mr. Doles testified that he was always in control of his beans and that he instructed Mr. Mitchell as to whether they were to be sold or stored. Mr. Mitchell never declined to buy or store beans from Mr. Doles.

The first delivery of the 1981 season was made sometime in September, and the deliveries ended in the first part of November. These beans were delivered for both storage and for sale. The delivery was made to the two locations described previously. In early December, 1981, Mr. Doles asked for an accounting for tax purposes. Mr. Mitchell prepared one for him. That accounting is introduced as the Trustee's Exhibit No. 21, and it shows 11,777 bushels of beans in storage as of December 3, 1981. Mr. Dole testified that no sales were authorized either on or after that date. The per bushel price of beans as of the first of 1982 was $5.75, and later, in January, the price was $6.51 per bushel.

Mr. Mitchell did discuss the market price of the beans through the end of January, 1982, with Mr. Doles, with specific reference to the beans Mr. Doles thought that he had in storage at the elevator. When the Chapter 11 proceeding was filed, on February 2, 1982, there were no beans in storage, anywhere.

Mr. Mitchell Price delivered 29,686.6 bushels of beans to Clayton Grain Elevator for storage only. At $6.21 per bushel, this amounts to $186,000.00. Mr. Price never authorized the sale of his beans. Mr. Mitchell told Mr. Price in late January that he should sell his crop, at $6.45 a bushel. When the Chapter 11 proceeding was filed, on February 2, 1982, there were no beans in storage, anywhere.

None of the beans belonging to Doles or to Price have been located. The Trustee testified that, as of the date of bankruptcy, there were no beans stored at the elevator in Clayton or at Concordia for the account of the Clayton Grain Elevator. The Trustee testified that there are 135,357.33 bushels of soybeans missing, and the disposition of the missing soybeans were not explained by the defendant, Mr. William Gary Mitchell. Valuing the soybeans at $6.00 per bushel, the soybeans would have a value of $812,143.98.

## CONCLUSIONS OF LAW

After reviewing the evidence and the testimony, it is evident to this Court that William Gary Mitchell breached his responsibility as an employee of the debtor corporation. It is clear that William Gary Mitchell manipulated the corporate accounts and the farmers' bean deposits for his own use and benefit and to that of his family members and business associates.

Neither William Gary Mitchell nor Elaine Mitchell testified at trial. Also, these defendants did not introduce evidence to controvert the testimony of the Trustee or the evidence submitted on behalf of the plaintiff.

In his memorandum, the defendants' attorney argues that the Trustee's search of the corporate records was incomplete. The defendants' attorney seems to be suggesting that a "more complete" search would reveal corporate authority for several of the actions taken by William Gary Mitchell. The defendants' attorney has misapplied the burden of proof. According to *La.*R.S. 12:82(d) "officers and agents shall have such authority and perform such duties in management of the property and affairs of the corporation as may be prescribed in the by-laws or by the board." The Trustee has convinced this Court that an officer in William Gary Mitchell's position would not ordinarily have the authority to make the dispositions of corporate property for his benefit as stated in the Findings of Fact. The burden then shifts to the defendant to prove to the Court that William Gary Mitchell did in fact have the authority from the corporate board of directors to make the dispositions of the corporate property for his benefit as stated in the Findings of Fact. All of the corporate records were available for examination and analysis as well as subject to the subpoena powers of this Court, but the defendants did not seek to make their own independent search. At trial, the defendants did not offer any evidence that such corporate authority existed.

The Court finds that the plaintiff has carried his burden of going forward with the evidence and that the influences in the proof are clear. It is the conclusion of this

Court that William Gary Mitchell did not testify, because he had no explanation about the money, the beans, BIM Equipment Company, the beagles, his daughter's Mustang, etc.

*SOYBEANS*

The Court concludes that William Gary Mitchell received beans for storage either at Clayton Grain Elevator or for the Clayton Grain Elevator at the Concordia Grain Elevator. Likewise William Gary Mitchell systematically sold the beans received for storage in order to cover his losses in the futures market or to supply capital for his various personal business ventures.

*BIM Equipment Company, B & M Trucking Company, I & M Cattle Company, Lee Bayou Kennels, and the Checking Accounts*

William Gary Mitchell had six elevator accounts which he used for elevator business. The Court concludes from the evidence introduced that Mitchell played a game referred to a "kiting" from one account to the next. The sale of soybeans brought infusions of new "operating capital" into the system, but the pyramid collapsed when there were no more beans available for sale.

The BIM Equipment Company and the B & M Trucking Company were "captive" companies, in that William Gary Mitchell and Beebe could operate each to their own personal benefit and for their own personal goals, rather than to the benefit of the creditors of either. Both Beebe and Mitchell were employees of the elevator.

If Mitchell and Beebe found it convenient, money could be "loaned" to the trucking company. The Trustee was able to trace $16,200 which was paid into the trucking company. The Trustee was able to trace $20,660.76 which was "loaned" to BIM Equipment Company. One of the Trustee's Exhibits indicates that BIM Equipment Company inventory was purchased with elevator funds.

B & M Trucking Company, once "capitalized" with elevator money, then proceeded to profit from its hauling for the elevator.

BIM Equipment Company was in a position to sell, and did sell, merchandise to the elevator while the elevator was actually financing the inventory and furnishing warehouse space to BIM. Neither BIM nor B & M had office facilities, and it is a reasonable assumption that the elevator carried that expense also, as well as the expense of some personnel. Walter Beebe was paid $22,750 from the elevator operating account as well as from the secret commodity account. BIM Equipment Company received $7,924.08 from the same secret commodity account on one occasion. Also B & M Trucking Company received $8,000 from the secret commodity account.

Lee Bayou Kennels received $5,255 from the regular elevator account and from the secret commodity account. Lee Bayou Kennels also received benefits from the debtor corporation via William Gary Mitchell.

The elevator bought seed for re-sale from DeKalb. Elaine Mitchell was careful in her accounting and was attentive to seeing that the elevator got all the funds it was entitled to. She was quick to note a shortage of some $4,374.37 in the spring of 1981. She wrote and demanded an accounting. DeKalb responded with an explanation and a copy of the cancelled check in the exact amount. Mitchell noted on the DeKalb letter that the money had, indeed, been received. *The elevator refund had been deposited in the Lee Bayou Kennels bank account, by designee.* William Gary Mitchell had simply neglected to inform his wife that he had taken the money.

The Trustee was unable to locate any record of the debtor corporation which authorized these "loans", overhead expenses, salaries, or "bonuses". Also, the defendant did not provide the Court with any proof of such corporate authority.

*Family Members, Furniture, and a Mobile Home*

From the debtor corporations assets as well as the unauthorized sale of beans belonging to the farmer-creditors, William

Gary Mitchell provided his family with a 1981 Ford Mustang (and repair services), a 1979 Honda ATC 110, furniture and appliance items, Mississippi real estate, and a rent-and utility-free mobile home. This was done in addition to divert cash payments, the extent of which can only be estimated.

## CONCLUSION

The Trustee has sued the defendants for declaratory relief with regard to certain movable property and a mobile home. The Court concludes that William Gary Mitchell and Elaine Mitchell are declared to be without a claim to any of the property located on the premises of the debtor corporation, and that the Trustee is granted the authority to liquidate this property for the creditors of the estate, since the property in question was acquired with corporate funds.

The Court also concludes that the bankrupt estate is declared to be the owner of the 1971 Akin Mobile Home because it appears that the Mobile Home was purchased with the debtor corporation's funds, and the Reverend William Mitchell received the title to the mobile home under very suspicious circumstances, which he could not explain to the Court. The Court also concludes that the Reverend Mitchell owes the debtor corporation the sum of $4,700.00, which the Reverend Mitchell received from the debtor corporation without consideration.

The Court also concludes that William Gary Mitchell took at least $837,791.22 from the various corporate accounts, without authority, and that this embezzlement was not explained by the defendant. This amount represents sums which are documented by particular transactions, and the liquidation value of soybeans left with the corporation for storage by farmers for which the corporation was responsible. The corporation is responsible for the acts of its employees, but the employees are answerable in damages to the employer.